## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| SANDRA FARMER COLLINS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) 1:13CV0981 |
| | ) |
| CAROLYN W. COLVIN, | ) |
| Acting Commissioner of Social | ) |
| Security, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

Plaintiff, Sandra Farmer Collins, brought this action pursuant to the Social Security Act (the "Act") to obtain judicial review of a final decision of Defendant, the Commissioner of Social Security, denying Plaintiff's claim for Supplemental Security Income ("SSI"). (Docket Entry 1.) The Court has before it the certified administrative record (cited herein as "Tr. __"), as well as the parties' cross-motions for judgment (Docket Entries 14, 18). For the reasons that follow, the Court should enter judgment for Plaintiff and should remand this matter for an award of benefits.

## I. PROCEDURAL HISTORY

Plaintiff filed an application for SSI on November 30, 2009 (protective filing date), alleging a disability onset date of November 1, 2009. (Tr. 144-50.) Upon denial of that application initially (Tr. 49-62, 78-81) and on reconsideration (Tr. 63-77, 86-95), Plaintiff requested a hearing de novo before an Administrative

Law Judge ("ALJ") (Tr. 96-97). Plaintiff, her attorney, and a vocational expert ("VE") attended the hearing. (Tr. 25-48.) By decision dated July 11, 2012, the ALJ determined that Plaintiff was not disabled under the Act. (Tr. 9-21.) On September 13, 2013, the Appeals Council denied Plaintiff's request for review (Tr. 1-6), making the ALJ's ruling the Commissioner's final decision for purposes of judicial review.

In rendering that disability determination, the ALJ made the following findings later adopted by the Commissioner:

1. [Plaintiff] has not engaged in substantial gainful activity since November 30, 2009, the application date.

. . . .

2. [Plaintiff] has the following severe impairments: [i]schemic heart disease, myocardial infarction status post stenting, coronary artery disease, diabetes mellitus type II, peripheral neuropathy, obesity, mild mental retardation/borderline intellectual functioning and major depression.

. . . .

3. [Plaintiff] does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

. . . .

4. . . . [Plaintiff] has the residual functional capacity to perform light work . . . except that she can lift 10 pounds frequently and 20 pounds occasionally; sit up to 6 hours and stand/walk up to 6 hours in an eight hour work day but must be allowed to alternate between sitting and standing at least two times each hour. She is limited to occasional climbing of stairs and ramps, balancing, stooping, kneeling, couching, and crawling, but must avoid climbing ladders, ropes[,] scaffolds and

unprotected heights. She can follow short, simple (not
detailed) instructions and perform routine tasks. She is
able to sustain attention and concentration for two hours
at a time, but cannot work at production rate or demand
pace. [Plaintiff] can perform work involving only
occasional public contact and interaction; should avoid
work environments dealing with crisis situations,
constant changes in routine settings and complex decision
making.

. . . .

5. [Plaintiff] is unable to perform any past relevant
work.

. . . .

9. . . . [T]here are jobs that exist in significant
numbers in the national economy that Plaintiff can
perform.

. . . .

10. [Plaintiff] has not been under a disability, as
defined in the [] Act, since November 30, 2009, the date
the application was filed.

(Tr. 14-21 (internal parenthetical citations omitted).)

## II. DISCUSSION

Federal law "authorizes judicial review of the Social Security
Commissioner's denial of social security benefits." Hines v.
Barnhart, 453 F.3d 559, 561 (4th Cir. 2006). However, "the scope
of [the Court's] review of [such a] decision . . . is extremely
limited." Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981).

## A. Standard of Review

"[C]ourts are not to try [a Social Security] case de novo."
Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). Instead,
the Court "must uphold the factual findings of the ALJ [underlying

the denial of benefits] if they are supported by substantial evidence and were reached through application of the correct legal standard." Hines, 453 F.3d at 561 (internal brackets and quotation marks omitted). "Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1992) (quoting Richardson v. Perales, 402 U.S. 389, 390 (1971)). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (internal citations and quotation marks omitted). "If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is substantial evidence." Hunter, 993 F.2d at 34 (internal quotation marks omitted).

"In reviewing for substantial evidence, the [C]ourt should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ, as adopted by the Social Security Commissioner]." Mastro, 270 F.3d at 176 (internal brackets and quotation marks omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Social Security Commissioner] (or the ALJ)." Id. at 179 (internal quotation marks omitted). "The issue before [the reviewing court], therefore, is not whether [the claimant] is

4

disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." <u>Craig v. Chater</u>, 76 F.3d 585, 589 (4th Cir. 1996).

When confronting that issue, the Court must take note that "[a] claimant for disability benefits bears the burden of proving a disability," <u>Hall v. Harris</u>, 658 F.2d 260, 264 (4th Cir. 1981), and that, in this context, "disability" means the "'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months,'" <u>id.</u> (quoting 42 U.S.C. § 423(d)(1)(A)).[1] "To regularize the adjudicative process, the Social Security Administration has . . . detailed regulations incorporating longstanding medical-vocational evaluation policies that take into account a claimant's age, education, and work experience in addition to [the claimant's] medical condition." <u>Id.</u> "These regulations establish a 'sequential evaluation process' to determine whether a claimant is disabled." <u>Id.</u> (internal citations omitted).

_____

[1]  The Act "comprises two disability benefits programs.  The Social Security Disability Insurance Program  . . . provides benefits to disabled persons who have contributed to the program while employed.  [SSI] . . . provides benefits to indigent disabled persons.  The statutory definitions and the regulations . . . for determining disability governing these two programs are, in all aspects relevant here, substantively identical." <u>Craig</u>, 76 F.3d at 589 n.1 (internal citations omitted).

This sequential evaluation process ("SEP") has up to five steps: "The claimant (1) must not be engaged in 'substantial gainful activity,' *i.e.*, currently working; and (2) must have a 'severe' impairment that (3) meets or exceeds the 'listings' of specified impairments, or is otherwise incapacitating to the extent that the claimant does not possess the residual functional capacity to (4) perform [the claimant's] past work or (5) any other work." Albright v. Comm'r of the Soc. Sec. Admin., 174 F.3d 473, 475 n.2 (4th Cir. 1999).[2] A finding adverse to the claimant at any of several points in the SEP forecloses an award and ends the inquiry. For example, "[t]he first step determines whether the claimant is engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied. The second step determines if the claimant is 'severely' disabled. If not, benefits are denied." Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at each of the first three steps, the "claimant is disabled." Mastro, 270 F.3d at 177. Alternatively, if a claimant clears steps one and two, but falters at step three, *i.e.*, "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment, the ALJ must assess the claimant's residual functional capacity

_____

[2] "Through the fourth step, the burden of production and proof is on the claimant. If the claimant reaches step five, the burden shifts to the [Commissioner] . . . ." Hunter, 993 F.2d at 35 (internal citations omitted).

('RFC')."  Id. at 179.[3]  Step four then requires the ALJ to assess whether, based on that RFC, the claimant can perform past relevant work; if so, the claimant does not qualify as disabled.  Id. at 179-80.  However, if the claimant establishes an inability to return to prior work, the analysis proceeds to the fifth step, whereupon the ALJ must decide "whether the claimant is able to perform other work considering both [the claimant's RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job."  Hall, 658 F.2d at 264-65. If, at this step, the Commissioner cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled.  Hines, 453 F.3d at 567.[4]

---

[3]  "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations."  Hines, 453 F.3d at 562 (noting that administrative regulations require RFC to reflect claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation marks omitted)).  The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)."  Hall, 658 F.2d at 265.  "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (e.g., pain)."  Hines, 453 F.3d at 562-63.

[4]  A claimant thus can establish disability via two paths through the SEP.  The first path requires resolution of the questions at steps one, two, and three in the claimant's favor, whereas, on the second path, the claimant must prevail at steps one, two, four, and five.  Some short-hand judicial characterizations of the SEP appear to gloss over the fact that an adverse finding against a claimant on step three does not terminate the analysis.  See, e.g., Hunter, 993 F.2d at 35 ("If the ALJ finds that a claimant has not satisfied any step of the process, review does not proceed to the next step.").

## B.  Assignment of Error - Listing 12.05

Plaintiff contends that the ALJ erred at step three of the SEP because she should have concluded that Plaintiff met subsection B and/or C of the mental retardation listing codified at 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05 ("Listing 12.05").  (Docket Entry 15 at 3-7.)[5]  With regard to Listing 12.05B, Plaintiff maintains that the ALJ improperly rejected her full scale IQ score of 57 resulting from the Wechsler Adult Intelligence Scale - Fourth Edition ("WAIS-IV") administered by consultative examiner Dr. Joseph P. Appollo on August 6, 2010.  (Id. at 4 (citing Tr. 15, 16, 452).)  Plaintiff further asserts that the ALJ rejected that IQ score "largely by focusing on Plaintiff's IQ score of 64 from 1979," but then "fail[ed] to provide any information to discount the IQ score of 64 . . . which still fall[s] in the range required in [Listing] 12.05C."  (Id.; see also Tr. 15-16, 248.)  Further, Plaintiff argues that the evidence of record establishes that she suffered deficits in adaptive functioning that initially manifested prior to age 22, as required by both Listing 12.05B and C, and that she possesses other impairments that impose additional and significant work-related limitations, as required by Listing

---

[5]  Effective September 3, 2013, the Social Security Administration replaced the term "mental retardation" with "intellectual disability" in its Listing of Impairments.  See Change in Terminology: "Mental Retardation" to "Intellectual Disability", 78 Fed. Reg. 46499-01 (Aug. 1, 2013).  Because this case commenced prior to the change and the ALJ utilized the old terminology, this Recommendation will use the term "mental retardation."

12.05C.  (Docket Entry 15 at 5-7.)  Plaintiff's arguments have merit and warrant remand for an award of benefits.

## 1. Listing 12.05B

In order to meet the requirements of Listing 12.05B, a claimant must demonstrate: 1) "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22" ("adaptive deficits"); and 2) a "valid verbal, performance, or full scale IQ of 59 or less."  20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 12.05B.  In regard to adaptive deficits, Plaintiff must prove that she had those deficits <u>both</u> 1) during the developmental period, i.e., prior to age 22 <u>and</u> 2) during the subsequent period of alleged disability.  <u>Hancock</u>, 667 F.3d at 475 (noting that "[e]ither finding alone," i.e., no adaptive deficits generally or no such deficits prior to age 22, "suffic[es] to support the conclusion that [the claimant] did not satisfy" Listing 12.05).  Although Listing 12.05B "does not expressly define 'deficits in adaptive functioning' . . . '[a]daptive activities' are described elsewhere in the [Mental Disorders] Listing . . . as 'cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for your grooming and hygiene, using telephones and directories, and using a post office.'"  <u>Blancas v. Astrue</u>, 690 F. Supp. 2d 464, 476 (W.D. Tex.

2010) (quoting 20 C.F.R. Pt. 404, Subpt. P, App'x 1, §§ 12.05 and 12.00(C)(1)); accord Hager v. Astrue, No. 2:09CV1357, 2011 WL 1299509, at *2 (S.D.W. Va. Mar. 31, 2011) (unpublished).[6]

In the portion of her decision addressing step three of the SEP, the ALJ did not specifically analyze whether Plaintiff's mild mental retardation met or equaled the requirements of Listing 12.05B. (See Tr. 14-21.) Rather, the ALJ focused her step three analysis on Listings 12.04B (Affective Disorders) and 12.05D, i.e., whether Plaintiff's "mental impairments . . . result[ed] in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration." (Tr. 16; see also Tr. 17.) Nevertheless, without specifically referencing Listing 12.05B, the ALJ did discuss the evidence relating to the two prongs of Listing 12.05B (adaptive deficits and an IQ score of 59 or less) in her analysis at step two of the SEP. (Tr. 15-16.) The Court should find that substantial evidence fails to support the ALJ's analysis with respect to Listing 12.05B.

---

[6] Similarly, a highly regarded treatise defines "adaptive functioning" as an individual's skills with respect to "communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, and safety." Diagnostic & Statistical Manual of Mental Disorders 41 (4th ed. text rev. 2007).

In discussing the components of Listing 12.05B, the ALJ found as follows:

> [Plaintiff] . . . underwent achievement testing and intelligence testing with Dr. Appollo who concluded that her general cognitive ability is within the extremely low range of intellectual functioning as measured by her Full Scale IQ score of 57. . . . He also concluded that [Plaintiff's] current intellectual functioning appeared consistent with her history while at the same time admitting that a review of her academic records would have been helpful. In fact, <u>[Plaintiff's] school records show an IQ of 64 in 1979 in the seventh grade</u>, and although she was placed in the Exceptional Child Services program, she was enrolled in regular classes 50% of the time in 1980. [Plaintiff's] school records demonstrate poor academic performance but they also show excessive school absenteeism, which could significantly affect academic achievement. . . . <u>A person's IQ is presumed to remain stable over time in the absence of any evidence of sudden change or trauma that could cause a change in intellectual functioning. Therefore, [Plaintiff's] drop of 1+ standard deviation (IQ of 64 to 57) is not reasonable in the absence of a major intervening head injury or other similar event. While [Plaintiff] has had a heart attack, she was otherwise neurologically intact, with a normal mental status and none of her medical records indicates a diminished mental capacity.</u> In addition, [Plaintiff's] IQ score of 57 is inconsistent with her ability to care for herself; inconsistent with her job history that expands from 1995-2002; and inconsistent with her ability to perform activities of daily living. She has a valid driver's license, performs various household chores, makes light meals, and while she has worked in several restaurants performing menial jobs for short periods, she has also assumed more responsible jobs in child care, and working with the elderly in nursing homes. An [ALJ] can properly reject IQ scores as inconsistent with the record when the scores, as in this case, are derived from a one-time examination by a non-treating psychologist, particularly if the scores are inconsistent with [Plaintiff's] daily activities and behavior. Accordingly, I reject and discredit the validity of [Plaintiff's] IQ scores as determined by Dr. Appollo. . . . I find that while [Plaintiff's] intellectual functioning is at the borderline range, and she has exhibited some problems

academically, she has not established deficits in adaptive functioning in terms of communication, self-care, home living, social/interpersonal skills, work, leisure or health prior to attaining age 22. As a result, I find that [Plaintiff] is not mentally retarded as defined by the regulations.

(Tr. 15-16 (internal citations omitted and emphasis added).)

Substantial evidence fails to support the ALJ's decision to discount Plaintiff's full scale IQ score of 57. In rejecting that IQ score, the ALJ relied principally on the opinion of state agency psychological consultant Dr. Ken M. Wilson. (Tr. 15, 74.) Dr. Wilson noted Plaintiff's childhood IQ scores of 57,[7] 72, and 75 from 1972 to 1973 and 84 in 1974, but, significantly, he did <u>not</u> acknowledge Plaintiff's 64 IQ score in 1979. (Tr. 74.) Dr. Wilson then opined that the IQ scores obtained by Dr. Appollo (including the 57 full scale IQ in question) were "wholly inconsistent [with Plaintiff's] level of functio[n]ing as measured in school," and "suggest[] lack of effort on [Plaintiff's] part, as a drop of 1+ standard deviation is not reasonable in the absence of a major intervening head injury or other similar event." (<u>Id.</u>) As quoted above, the ALJ implicitly adopted Dr. Wilson's opinion, stating that "[Plaintiff's] drop of 1+ standard deviation (<u>IQ of 64 to 57)</u>

---

[7] Dr. Wilson placed a "(?)" after Plaintiff's childhood IQ score of 57, apparently indicating that he questioned the validity of that score on some unidentified basis. (Tr. 74.) He then found "unreasonable" the difference of "1+ standard deviation" between Plaintiff's childhood IQ scores and Dr. Appollo's finding as to Plaintiff's IQ. (<u>Id.</u>) Clearly, Dr. Wilson did not consider Plaintiff's childhood IQ score of 57 in formulating that opinion, as that score matches Plaintiff's full scale IQ from Dr. Appollo's examination. (<u>Compare</u> Tr. 220, <u>with</u> Tr. 459.)

is not reasonable in the absence of a major intervening head injury or other similar event."  (Tr. 15 (emphasis added).)

Based on the emphasized portion of the that statement, the ALJ clearly misinterpreted Dr. Wilson's opinion regarding a drop of "1+ standard deviation" in Plaintiff's IQ scores.  The IQ scores in Listing 12.05 are based upon IQ tests where a standard deviation represents 15 points in an IQ score.  See 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 12.00D.6.c ("The IQ scores in 12.05 reflect values from tests of general intelligence that have . . . a standard deviation of 15.").  Accordingly, Dr. Wilson found the difference between Plaintiff's childhood scores of 72, 75, and 84, and Dr. Appollo's score of 57 (15, 18, and 27 points, respectively), to constitute a drop of "1+ standard deviation," i.e., an "unreasonable" finding absent intervening head trauma.  (Tr. 74.) The ALJ, however, chose to compare Plaintiff's 1979 IQ score of 64 (a score Dr. Wilson never acknowledged) with Dr. Appollo's score of 57, and then erroneously concluded that the difference of just 7 points between those two scores amounted to "1+ standard deviation" and therefore rendered Dr. Appollo's 57 score "unreasonable."  This faulty reasoning precludes a finding that substantial evidence supports the ALJ's decision.

Similarly, substantial evidence does not support the ALJ's conclusion that Plaintiff failed to establish deficits in adaptive functioning prior to age 22.  Significantly, the ALJ primarily

13

relied upon Plaintiff's work history and daily activities to find a lack of adaptive deficits prior to age 22 (Tr. 15); however, none of this evidence relating to Plaintiff's prior jobs and daily activities relates to the time period prior to Plaintiff's 22nd birthday. For example, the ALJ expressly acknowledged that Plaintiff's "job history . . . expands from 1995 [to] 2002" (Tr. 16), during which time Plaintiff ranged in age from 29 to 36 years old (see Tr. 20 (reflecting Plaintiff's birth date)). Further, Plaintiff's hearing testimony (May 2012) and statements on a Function Report (April 2010) on which the ALJ relied to find that Plaintiff can perform "various household chores" and "make[] light meals" (Tr. 16), constitute contemporaneous statements of Plaintiff's abilities, not accounts that relate back to the time period prior to her 22nd birthday (see, e.g., Tr. 34, 196, 198, 199).[8] The ALJ made no attempt at the hearing, beyond asking Plaintiff to identify "the highest level of education" she had completed (Tr. 28) and whether she had pursued "any other type of coursework" after leaving school (Tr. 29), to elicit testimony regarding Plaintiff's abilities to communicate, care for herself, maintain a home, relate with others, or work prior to her 22nd birthday. (See Tr. 27-48.)

---

[8] Moreover, Plaintiff's testimony at the hearing does not support the ALJ's conclusion that Plaintiff "performs various household chores [and] makes light meals" (Tr. 16). Plaintiff testified that she lived with her brother and that he did all of the cooking and cleaning. (Tr. 34.) The ALJ did not challenge Plaintiff's testimony in that regard or ask Plaintiff to elaborate further. (See Tr. 34-48.)

Compounding the ALJ's failure to properly elicit and consider evidence as to Plaintiff's functionality prior to age 22, the ALJ erred in evaluating Plaintiff's school records. (Tr. 15.) Although the ALJ emphasized that Plaintiff "was enrolled in regular classes 50% of the time in 1980" (id.; see Tr. 228-29), the ALJ glossed over the more significant facts that Plaintiff's poor school performance and test scores qualified her for special education from first grade continuously through seventh grade (Tr. 225, 228-44, 249-50), that Plaintiff repeated the seventh grade (Tr. 224), that Plaintiff's seventh grade Wide Range Achievement Test ("WRAT") scores placed her reading, spelling, and math abilities between three and four grade levels below her actual grade (Tr. 231, 233), and that Plaintiff mostly earned D's and E's in her classes during both her years in seventh grade (Tr. 223-24).[9] Indeed, Plaintiff's school records, as virtually the only evidence of Plaintiff's functioning prior to age 22, conclusively show that she did indeed experience the requisite adaptive deficits before age 22. Such poor school performance "is directly material" to Listing 12.05's requirement of deficits in adaptive functioning during the developmental period. Jackson v. Astrue, 467 F. App'x 214, 218 (4th Cir. 2012); see also Salmons v. Astrue, No. 5:10-CV195-RLV, 2012 WL 1884485, at *7 (W.D.N.C. May 23, 2012)

---

[9] Although the record contains Plaintiff's "social" and "personal" marks for first and seventh grade (Tr. 221), the record does not contain Plaintiff's academic marks from any other grade level than seventh (Tr. 223-24). (See generally Tr. 220-50.)

(unpublished) (recognizing that "functional academic skills"
represent primary measure of adaptive functioning before age 22);
Smith v. Astrue, C.A. No. 3:10-66-HMH-JRM, 2011 WL 846833, at *2
(D.S.C. March 7, 2011) (unpublished) (holding that documentation of
scholastic achievement "substantially below grade level . . .
demonstrat[ed] that [the plaintiff] portrayed deficits in adaptive
behavior during her developmental period"); Watson v. Astrue, 729
F. Supp. 2d 786, 788 (E.D.N.C. 2010) ("The totality of [the]
[p]laintiff's school records indicate that deficits in adaptive
functioning manifested before the age of 22.").

Moreover, the ALJ did not make any finding as to whether
Plaintiff demonstrated adaptive deficits during the period of
alleged disability. (See Tr. 12-21.) In fact, the evidence of
record compels a finding that Plaintiff suffered adaptive deficits
during the relevant period. On a Function Report (which Plaintiff
asked a claims examiner to complete over the telephone because of
Plaintiff's "poor spelling" (Tr. 203)), Plaintiff indicated that
she lived with her fiancé, that she could do minimal housework such
as making her bed and doing some laundry for ten minutes at a time,
that she could spend about five minutes making a sandwich but did
not cook, that she drove to the grocery store but did not go inside
as it involved "too much walking," that she could not pay bills,
count change, handle a savings account, or use a checkbook because
of poor math skills, and that she had trouble following written

instructions due to poor reading and spelling abilities (Tr. 196,
198, 199, 201).  Subsequently, at the hearing, Plaintiff testified
that she had trouble reading and that a friend helped her read the
letters and forms she received in her disability case.  (Tr. 28-
29.)  Plaintiff further testified that she lived with her brother
and that he did all of the cooking and cleaning.  (Tr. 34.)  Such
minimal daily activities and lack of ability to live independently
convincingly demonstrate the requisite adaptive deficits.  See
Martin v. Colvin, No. 1:11CV408, 2014 WL 4114207, at *7-8 (M.D.N.C.
Aug. 20, 2014) (unpublished) (Peake, M.J.) (finding facts that the
plaintiff had "rarely, if ever, lived alone" and had trouble
"paying bills and maintaining a residence" as "unquestionabl[e]"
evidence of adaptive deficits), recommendation adopted, slip op.
(M.D.N.C. Sept. 11, 2014) (Schroeder, J.); compare Hancock, 667
F.3d at 476 (finding no adaptive deficits generally where claimant
could "shop, pay bills, and make change; . . . take[] care of three
small grandchildren at a level of care that satisfies the
Department of Social Services; . . . do[] the majority of her
household's chores, including cooking and baking; . . . attend[]
school to obtain a GED; and . . . do[] puzzles for entertainment").

The ALJ also mischaracterized Plaintiff's work history.  The
ALJ remarked that Plaintiff's "job history . . . expands from 1995-
2002," and that, "while she has worked in several restaurants
performing menial jobs for short periods, she has also assumed more

17

responsible jobs in child care, and working with the elderly in nursing homes." (Tr. 16.)  In actuality, Plaintiff stated that she watched a five-year-old five hours a day for "[a]bout six months" and cared for a six-year-old and a one-year-old five to seven hours a day for an unspecified length of time sometime between 1995 and 1998.  (Tr. 46-48 (emphasis added).)  Further, Plaintiff earned just $2,287.20 in her only reported job assisting the elderly (see Tr. 157-58); at her reported rate of pay ($5.50 per hour for 28 hours a week, or $154 per week) (see Tr. 192), Plaintiff thus only held that job for a few months.[10]

Accordingly, the ALJ inappropriately minimized the fact, demonstrated by Plaintiff's testimony (Tr. 28-30, 46-48), work history report (Tr. 186-95), and earning records (Tr. 155-58), that Plaintiff held only a variety of unskilled jobs for very short periods of time.  Moreover, the record reflects that four to five different employers terminated her employment because she was too slow.  (Tr. 29, 37.)  These facts all undermine the ALJ's ruling. See Martin, 2014 WL 4114207, at *8 (finding evidence of adaptive deficits where, "contrary to the ALJ's statement at the hearing that [the p]laintiff 'ha[d] worked for years and years,' [the p]laintiff's work records demonstrate that she maintained her past jobs for a maximum of three to four months each, and sometimes much

---

[10] Significantly, the VE did not even characterize that job as past relevant work.  (Tr. 42-43.)

less" . . . [and] rarely, if ever, earned enough to classify her work as substantial gainful activity").

In sum, substantial evidence fails to support the ALJ's analysis regarding whether Plaintiff's mild mental retardation met or equaled Listing 12.05B because the ALJ made consequential errors in discounting an IQ score of 57 and because the record establishes, as a matter of law, that Plaintiff suffers from adaptive deficits that manifested prior to age 22. Generally, remand for reconsideration of whether Plaintiff satisfied the under 60 IQ requirement of Listing 12.05B might represent the proper next step; however, in light of the following recommendation with respect to Listing 12.05C, the Court should instead remand the case for an award of benefits.

## 2. Listing 12.05C

A claimant can meet Listing 12.05C by establishing: 1) "a showing of [adaptive] deficits . . . (Prong 1)"; 2) "a valid verbal, performance, or full scale IQ of 60 through 70 (Prong 2)"; and 3) "a physical or other mental impairment imposing an additional and significant work-related limitation of function (Prong 3)." Hancock, 667 F.3d at 473 (4th Cir. 2012) (internal quotation marks omitted).

"In evaluating a claimant's impairment, an ALJ must fully analyze whether a claimant's impairment meets or equals a 'Listing' where there is factual support that a listing could be met." Cook

v. Heckler, 783 F.2d 1168, 1172 (4th Cir. 1986). More specifically, when an ALJ finds that a claimant has a severe impairment and the record contains evidence of related "symptoms [that] appear to correspond to some or all of the requirements of [a listing] . . . [the ALJ must] explain the reasons for the determination that [the claimant's severe impairment] did not meet or equal a listed impairment." Id. Here, the ALJ erred because she wholly failed to analyze whether Plaintiff's mild mental retardation met or equaled the requirements of Listing 12.05C (see Tr. 12-21), despite evidence (detailed in the prior section and below) establishing all three prongs of that listing. See Garner v. Colvin, No. 1:12CV1280, 2015 WL 710781, at *4-9 (M.D.N.C. Feb. 18, 2015) (unpublished) (Webster, M.J.) (recommending remand where "ALJ failed to consider Listing 12.05C when there was ample evidence to trigger such an analysis"); see also Morgan v. Colvin, No. 7:13-CV-279-BO, 2014 WL 6473525, at *2 (E.D.N.C. Nov. 18, 2014) (unpublished) ("The ALJ's failure to consider Listing 12.05C in this instance, where there is obviously evidence that may support the listing, is clear error.").

First, Plaintiff's school records contain an IQ score of 64 from 1979 obtained at age 12 (Tr. 248), which falls within the range of Listing 12.05C. Although the Commissioner challenges that score on the ground that IQ scores obtained between the ages of 7 and 16 remain valid for only two years (Docket Entry 19 at 14-15

(citing 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 112.00D.10)), that argument fails for two reasons. First, the ALJ did not discount the 64 IQ score on that basis (or any other basis) (see Tr. 12-21), and the Court should not engage in post-hoc rationalization of the ALJ's decision, see Radford v. Colvin, 734 F.3d 288, 294 (4th Cir. 2013) (rejecting Commissioner's argument in part because it consisted of "a post[-]hoc rationalization") (citing Christopher v. SmithKline Beecham Corp., ___ U.S. ___, 132 S. Ct. 2156, 2166-67 (2012)). Second, and more significantly, the ALJ actually credited the 64 IQ score when she used it as a basis for discrediting the 57 IQ score from Dr. Appollo's examination. (Tr. 15.) No reason thus exists to remand the case for the ALJ to make a finding about the validity of the 64 IQ score because the ALJ already deemed it valid.

Additionally, as discussed above in the context of Listing 12.05B, substantial evidence does not support the ALJ's conclusion that Plaintiff failed to establish adaptive deficits prior to age 22, and, indeed, the record conclusively shows that Plaintiff suffered from such deficits both prior to age 22 and during the time she claimed disability.

Finally, the parties agree, and the record definitively establishes, that Plaintiff suffered from other impairments that imposed additional work-related limitations. At step two of the SEP, the ALJ labeled as severe Plaintiff's ischemic heart disease,

myocardial infarction status post stenting, coronary artery disease, diabetes mellitus type II, peripheral neuropathy, and obesity (Tr. 14-16), and then (at the RFC stage) limited Plaintiff to light work with numerous postural limitations (Tr. 17-19), which precluded her from performing any past relevant work (Tr. 20). See Flowers v. United States Dep't of Health & Human Servs., 904 F.2d 211, 214 (4th Cir. 1990) ("In this circuit, we follow the rule that if a claimant cannot return to his past relevant work, he has established a work-related limitation of function which meets the requirements of § 12.05(C)."); Wallace v. Astrue, No. 5:09CV359FL, 2010 WL 2520084, at *3 (E.D.N.C. June 21, 2010) (unpublished) ("[T]he 'work-related limitation of function' requirement of § 12.05C is satisfied where a claimant is found to have a 'severe impairment' at step two of the five-part analysis." (citing, inter alia, Luckey v. United States Dep't of Health & Human Servs., 890 F.2d 666, 669 (4th Cir. 1989))). As a result, the Court should conclude that Plaintiff possessed "a physical or other mental impairment imposing an additional and significant work-related limitation of function (Prong 3)," Hancock, 667 F.3d at 473 (internal quotation marks omitted).

In conclusion, the record establishes that Plaintiff met Listing 12.05C and the Court thus should hold that substantial evidence fails to support the ALJ's contrary decision, as well as that the ALJ employed incorrect legal standards in rendering said

ruling. "If the reviewing court decides that the ALJ's decision is not supported by substantial evidence, it may affirm, modify or reverse the ALJ's ruling 'with or without remanding the cause for a rehearing.'" Radford, 734 F.3d at 295 (quoting 42 U.S.C. § 405(g)). As shown in the discussion above, unlike in Radford, this case does not involve significant "ambivalence of the medical record," id. at 296; rather, undisputed evidence conclusively demonstrates that Plaintiff satisfied Listing 12.05C. Under these circumstances, the Court should enter judgment for Plaintiff and should remand only for the purpose a benefits award, consistent with the approach adopted by other courts in this Circuit in analogous cases, see, e.g., Richardson v. Colvin, No. 8:12CV3507JDA, 2014 WL 793069, at *20 (D.S.C. Feb. 25, 2014) (unpublished); Watson v. Astrue, Civil Action No. CBD-11-2491, 2013 WL 136425, at *7-8 (D. Md. Jan. 9, 2013) (unpublished); Holtsclaw v. Astrue, No. 1:10CV199, 2011 WL 6935499, at *6 (W.D.N.C. Dec. 30, 2011) (unpublished); Davis v. Astrue, C/A No. 2:07–1621–JFA–RSC, 2008 WL 1826493, at *5 (D.S.C. April 23, 2008) (unpublished).

**IT IS THEREFORE RECOMMENDED** that the Commissioner's decision finding no disability be reversed, that Plaintiff's Motion for Summary Judgment (Docket Entry 14) be granted, that Defendant's

Motion for Judgment on the Pleadings (Docket Entry 18) be denied, and that this action be remanded for an award of benefits.


                              /s/ L. Patrick Auld
                              **L. Patrick Auld**
                      **United States Magistrate Judge**

February 25, 2015